# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHEN BRANCH,** | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 20-2323 |
| | : | |
| **TEMPLE UNIVERSITY et al.,** | : | |
| *Defendants.* | : | |

### MEMORANDUM

**KENNEY, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　July 7, 2021

　　Plaintiff, Stephen Branch, filed this suit against his former employer, Temple University ("Temple"); his former supervisor, Sean Ounan; and Temple's head of Human Resources, Sharon Boyle, (collectively "Defendants") for unlawful termination under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act, and the Pennsylvania Human Relations Act.

　　Before the court is Defendants' Motion (ECF No. 64) under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* to preclude Plaintiff's economic damages expert, Chad Staller, from testifying at trial and to preclude Plaintiff from making any use of, or reference to, Staller's Report at trial. 509 U.S. 579, 590 (1993). For the reasons that follow, the Motion is granted in part and denied in part.

### I.　　FACTUAL BACKGROUND

　　Stephen Branch was dismissed from his position as a Roving Engineer from Temple on January 29, 2020. Branch alleges he was terminated from Temple because of his race and/or in retaliation for having complained of racial discrimination and retaliation to multiple individuals

1

within Temple's management and Equal Employment Opportunity Office ("EEO"), as well as the Equal Employment Opportunity Commission ("EEOC").

Branch began working at Temple in 2004. While working at Temple, Branch also worked full-time at CBRE, Inc. ("CBRE") since 2018. He worked for Main Line Hospitals in 2017 and then resumed his employment on February 9, 2020 after his separation from Temple. Also while working at Temple, Branch worked several part-time jobs at U.S. Facilities, St. Joseph's Hospital, Mercy Hospital, IRS Building, and La Salle University. After his termination from Temple, Branch became employed at St. Joseph's University ("SJU").

Defendants have filed a *Daubert* Motion to preclude the testimony of Plaintiff's economic damages expert, Chad Staller, based on the reliability of his opinion. Staller created a report ("Staller Report") on January 20, 2021 that calculated a total of $440,626 in damages as a result of Branch's termination of employment. This total is comprised of $88,496 in lost back pay, $89,249 in lost front pay, and $262,881 in lost tuition remission.

Defendants assert that the Staller Report is not reliable and should be precluded because the Staller Report (1) misreads the policy regarding tuition remission available through Branch's new employer; (2) misstates Temple's retirement benefits; (3) relies on an inapplicable study of "displaced workers"; and (4) fails to offset Branch's damages with his income at University of Pennsylvania.

Plaintiff responds that Defendants' arguments are appropriate for cross-examination and that Defendants have not provided any legal disqualifying reasons why Staller should be precluded from testifying. Plaintiff emphasizes that Staller's Report is based on reliable methods and procedures of science and therefore should be admissible.

II. **LEGAL STANDARD FOR THE ADMISSIBLILTY OF EXPERT OPINION**

In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 imposes a "gatekeeping" obligation on district courts to ensure that all expert testimony admitted is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). This standard applies not only to "scientific knowledge" but also "technical" and "other specialized" knowledge under Federal Rule of Evidence 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has held that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *In Re Paoli R.R. Yard PCB Litig.*, 35 F.3d 716, 741–42 (3d Cir. 1994); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

The Third Circuit has a liberal standard of qualifying experts. *In Re Paoli*, 35 F.3d at 741; *Elcock*, 233 F.3d at 742. To qualify an expert, Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). The Third Circuit instructs district court to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. *Id.* at 525. An expert can be qualified based on a broad range of knowledge, skills, training, and experience. *In Re Paoli*, 35 F.3d at 741. The "fit" prong is satisfied when the expert's testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving the factual dispute. *Daubert*, 509 U.S. at 590. This requirement goes primarily to

relevance; expert testimony that does not relate to any issue in the case is irrelevant and non-helpful. *Id.* at 591.

Defendants' Motion challenges only the reliability of the expert's testimony. An expert's testimony is reliable if it is grounded in "methods and procedures of science" rather than on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. This inquiry is a "flexible one" that focuses "solely on the principles and methodology, not on the conclusions they generate." *Id.* at 594-95. The expert's opinion need only be reliable—not correct. *In Re Paoli*, 35 F.3d at 744. However, when an expert's opinion is not sufficiently supported with evidence or when indisputable facts contradict or otherwise render the expert's opinion unreasonable, the expert's testimony is not admissible. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012); *Elcock*, 233 F.3d at 754.

The Supreme Court and the Third Circuit have set out a list of factors to consider when determining whether an expert testimony's is reliable, including:

> (1) Whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Daubert*, 509 U.S. at 593–95; *In Re Paoli*, 35 F.3d at 742. The Supreme Court clarified in *Kumho Tire Co.* that this list is non-exhaustive and that each factor need not be applied in every case. 526 U.S. at 152.

Even if an expert's methodology is reliable, the testimony may still be excluded if the conclusions do not reliably flow from the facts known to the expert. *See General Elec. Co.*, 522 U.S. at 146; *ZF Meritor, LLC*, 696 F.3d at 29; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d

4

Cir. 2000). For instance, the Supreme Court precluded an expert's testimony in *General Electric Co.* because there was simply too great an analytical gap between the data and opinion presented. 522 U.S. at 146. The respondent's expert was proffered to testify that lung cancer was linked to polychlorinated biphenyl exposure, yet the studies he relied on to show such linkage either made the opposite conclusion—that PCBs do not cause cancer—or did not even mention PCBs. *Id.* at 143. The Court recognized that, under *Daubert*, the focus "must be solely on principles and methodology, not on the conclusions that they generate," but neither *Daubert* nor the Federal Rules of Evidence requires a district court to admit an expert's opinion that is completely unsupported from the existing facts. *Id.* at 146.

Similarly, the Third Circuit in *ZF Meritor, LLC* excluded an economist's damages calculations because, although the expert's methodologies were regularly employed by economists, the underlying data was not sufficiently reliable. 696 F.3d at 291. The expert relied on a set of profit and volume projections but did not know who calculated the figures, the methods used, or assumptions relied upon. *Id.* at 293. The court concluded the expert lacked critical information necessary for cross-examination, which rendered his testimony inadmissible. *Id.*

In contrast, the court in *Warren Hill, LLC v. Neptune Investors, LLC* held an expert's calculations were reliable and thus admissible because the expert explained how he arrived at each calculation and why he included or excluded numbers in his analysis. No. 20-452, 2021 WL 2044389, at *6 (E.D. Pa. May 20, 2021). Simply because the plaintiff disagreed with the expert's conclusions, the court reasoned, did not render his opinion unreliable. *Id.* Instead, the plaintiff may challenge the weight and sufficiency of the evidence underlying these opinions on cross-examination. *Id.*

Moreover, the Third Circuit does not require mathematical exactness, only that an expert's calculations be accompanied by sufficient factual foundation before submission to the jury. *Elcock*, 233 F.3d at 754; *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983); *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 643 (3d Cir. 1987) (describing speculative calculations as a "castle made of sand"). The Third Circuit excluded the expert testimony in *Elcock*, *Gumbs*, and *Benjamin* because each damages expert estimated the plaintiff's future earning loss as more than double the plaintiff's income preceding the injury and provided no factual foundation for such a dramatic increase. *See Elcock*, 233 F.3d at 756; *Gumbs*, 718 F.2d at 98; *Benjamin*, 820 F.2d at 642–43. The Third Circuit in *Elcock* emphasized the risk of admitting expert testimony with such glaring factual inaccuracies because juries are more likely to adopt such gross figures advanced by a witness presented as an expert. *See* 233 F.3d at 756.

### III. **DISCUSSION**

Turning to the facts of this case, the Defendants' *Daubert* Motion to preclude Plaintiff's expert, Chad Staller, from testifying during trial will be granted in part and denied in part. The Staller Report divides the total damages into three subparts: (1) lost back pay, (2) lost front pay, and (3) lost tuition remission. The *Daubert* Motion will be denied with respect to the lost back pay calculations. The *Daubert* Motion will be granted with respect to both calculations of lost front pay and lost tuition remission. The lost front pay and tuition remission calculations, as opposed to the lost back pay calculations, rest on assumptions unsupported by the factual record and are therefore unreliable. *See General Electric Co.*, 522 U.S. at 146; *ZF Meritor, LLC*, 696 F.3d at 290; *Elcock*, 233 F.3d at 754.

### A. **Lost Back Pay**

The Defendants' *Daubert* Motion will be denied with respect to the Staller Report's calculation of $88,496 in lost back pay. The lost back pay calculations are reliable because the Staller Report provides sufficient factual foundation for the analysis and uses "methods and procedures of science" to calculate given numbers. *See Daubert*, 509 U.S. at 590; *In Re Paoli*, at 744.

Like the expert in *Warren Hill, LLC*, who explained each calculation and why he chose certain numbers, Staller explains why certain numbers were included and excluded in the lost back pay analysis and shows how he calculated the given numbers. *See* 2021 WL 2044389, at *6. Although Defendants dispute Branch's contributions to Temple's retirement plan, which were used in the lost back pay analysis, Defendants may challenge the weight and sufficiency of the evidence underlying these opinions on cross-examination. *See Daubert*, 509 U.S. at 596.

### B. Tuition Remission

The Defendants' *Daubert* Motion will be granted with respect to the Staller Report's calculation of $262,881 in tuition remission damages. The Staller Report assumes that four of Branch's children planned to utilize Temple's tuition remission benefit. As an employee at SJU, the Staller Report states that Branch will only be eligible for tuition remission after four consecutive years of employment. The Staller Report directly cites SJU's website for this assertion. To arrive at $262,881 in damages, Staller sums eight semesters (four years) of Temple's tuition, for each of Branch's four children, and adjusts for a 2.23% increase in tuition costs.

However, SJU's tuition remission policy, cited directly in the Staller Report, clearly indicates that Branch's children would be eligible for the tuition remission program immediately and not after four years. The policy states:

7

> After four consecutive years of benefits-eligible employment, employees are eligible for the tuition remission benefit for spouses and dependent children. Applicants must meet all University admission requirements. ***Employees who were employed on a full-time basis immediately prior to joining the University by a public or private educational institution offering a baccalaureate or advanced degree will be credited with the related number of years and months of continuous full-time employment at that institution towards the four continuous years of full-time service required by the University.*** Employees must provide the Office of Human Resources with a letter from the former institution(s) stating the dates of prior full-time service.

*Tuition Remission*, Saint Joseph's Univ., https://www.sju.edu/offices/human-resources/working-at-sju/benefits/tuition-remission) (last visited July 1, 2021) (emphasis added). The language of this policy indicates that Branch's 15 years of employment at Temple would be credited toward SJU's four consecutive year requirement, which would make Branch's children immediately eligible for the benefit.

There is simply too great an analytical gap between the Staller Report's tuition remission calculation and SJU's tuition remission policy for that portion of the opinion to be considered reliable. *See General Elec. Co.*, 522 U.S. at 146. Although the Third Circuit does not require "mathematical exactness," Staller's calculation is blatantly contradicted by the plain language of SJU's policy in such a way that renders Staller's opinion unreasonable. *See ZF Meritor, LLC*, 696 F.3d at 290. Staller's conclusions are nearly identical to precluded testimony in *General Elec. Co.* where the expert opined PCBs were linked to lung cancer, yet cited studies concluding the opposite—that PCBs *did not* cause cancer. *See* 522 U.S. at 145–46. Unlike the economist in *Warren Hill, LLC*, whose testimony was admissible because it outlined the underlying methodology and reasons for including and excluding certain data in the calculations, Staller provided no reasons for why he concluded Branch's children were not immediately eligible for tuition remission at SJU when he cited to the SJU policy. *See Warren Hill, LLC*, 2021 WL 2044389, at *6.

8

The Third Circuit requires an expert's calculations to be based on a proper factual foundation before being submitted to the jury, and the Staller Report makes a conclusion wholly unsupported by the indisputable language of SJU's website. *See Elcock*, 233 F.3d at 755; *Gumbs*, 718 F.2d at 98. When an expert opinion is not supported by sufficient facts and is based on "subjective belief or unsupported speculation," the judge must act as a "gatekeeper" and exclude such unreliable testimony. *See Daubert*, 509 U.S. at 590; *ZF Meritor, LLC*, 696 F.3d at 290.

C. **Lost Front Pay**

The Defendants' *Daubert* Motion will also be granted with respect to the Staller Report's calculation of $89,349 in in lost front pay damages. To support this conclusion, the Staller Report "consider[ed] data on individuals who were displaced from their jobs which indicates that 48.8% of workers who were displaced between 2017 and 2019 and subsequently found work had caught up to or exceeded their previous reported earnings by January 2020, a period of at most three years" and cites a U.S. Bureau of Labor Statistics survey. *See Worker Displacement: 2017-19*, U.S. Bureau of Lab. Stats. (Aug. 27, 2020, 10:00 AM), https://www.bls.gov/news.release/disp.htm. The survey defines a "displaced worker" as "persons 20 years of age and over who lost or left jobs because their plant or company closed or moved, there was insufficient work for them to do, or their position or shift was abolished." *Id.* Based on this article about "displaced workers," the Staller Report concludes that it will take Branch five years of working at SJU to "catch up" to his earnings at Temple.

This opinion is unreliable for multiple reasons. First, the Staller Report summarily concludes that Branch is a "displaced worker" and provides no explanation why Branch fits the survey's definition or why the survey is relevant. There is no indication in the record that Branch lost his job because Temple closed or moved, there was insufficient work for him to do, or that

9

his position or shift was abolished. With no factual foundation, concluding Branch is a "displaced worker" is merely "unsupported speculation" and therefore precluded under *Daubert*. *See* 509 U.S. at 590. By relying on a seemingly irrelevant article about "displaced workers," the Staller Report's lost front pay calculations are not "ground[ed] in methods and procedures of science" and thus inadmissible under *Daubert*. *See id.*

Second, even if Branch is a "displaced worker," the Staller Report fails to explain why it will take Branch *five years* to "catch up" to his previous salary, when the data it relied on "indicates that 48.8% of workers who were displaced . . . had caught up to or exceed their previous earnings by . . . at most *three years*" (emphasis added). Even more puzzling, upon close examination of the U.S. Bureau of Labor Statistics survey results, the survey states that it takes 65%—not 48.8%—of displaced workers three years to catch up or exceed their previous earnings. *See Worker Displacement: 2017-19*, U.S. Bureau of Lab. Stats. (Aug. 27, 2020, 10:00 AM), https://www.bls.gov/news.release/disp.htm. Such factual discrepancies and lack of explanation render the Staller Report's lost front pay calculations unreliable. *See id.; ZF Meritor, LLC*, 696 F.3d at 293.

There is no reliable link, as required by *Daubert*, between the results of the "displaced workers" survey and the lost front pay calculations in the Staller Report. *See ZF Meritor, LLC*, 696 F.3d at 293. Therefore, the lost front pay calculations are inadmissible under *Daubert*. *See* 509 U.S. at 590.

### IV. Conclusion

For the foregoing reasons, Defendants' *Daubert* Motion will be granted with respect to Staller's lost front pay calculations and tuition remission calculation. Defendants' *Daubert* Motion will be denied with respect to Staller's lost back pay calculations.

**BY THE COURT:**

**/s/ Chad F. Kenney**
_____
**CHAD F. KENNEY, JUDGE**