# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHEN BRANCH,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 20-2323** |
| | : | |
| **TEMPLE UNIVERSITY et al.,** | : | |
| *Defendants.* | : | |

### MEMORANDUM

**KENNEY, J.**                                                          **August 12, 2021**

Plaintiff, Stephen Branch, filed this suit against his former employer, Temple University ("Temple"), his former supervisor, Sean Ounan, and Temple's head of Human Resources, Sharon Boyle, (collectively "Defendants") for race discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, and claims of interference and retaliation under the Family and Medical Leave Act ("FMLA"), and the Pennsylvania Human Relations Act. Before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 against all of Plaintiff's claims. ECF No. 65.

## I.      FACTUAL BACKGROUND

Plaintiff, Stephen Branch ("Plaintiff" or "Branch"), was hired as a roving engineer by Temple in 2004. Roving engineers are responsible for responding to maintenance calls, inspecting campus buildings for normal system operations, identifying and reporting system malfunctions, and calling in emergencies such as fire or flood. Roving engineers are required to record their rounds by initialing a logbook located at each building the roving engineer is assigned to inspect during every shift. Alternatively, a roving engineer may use an electronic software application, LogCheck, to record his or her rounds instead of initialing a logbook.

1

Temple terminated Branch's employment on January 29, 2020 for violating Temple's "Work Rules" D.2 – Fraudulent Statements or misrepresentations in employment (for submitting distribution cards for work he had not performed); D.4 – Falsification or Misrepresentation of Records (for misrepresenting the time he claimed to have worked on his distribution cards); D.6 – Leaving Campus without Permission (for leaving campus during his shift without authorization or advising any supervisor); and D.8 – Insubordination (for his repeated failures to comply with the directives of his supervisors to carry out his required duties of signing the log books or recording his rounds in the LogCheck application). According to Temple's Work Rules, the punishment for a first-time Category D violation is termination. Ex. 19.

Defendants deny any claims of racial discrimination and assert that Branch was terminated because he failed to sign 23 of the 24 logbooks he was assigned to during his three consecutive shifts on January 19, 20, and 21 in 2020. Additionally, Defendants contend that video footage shows that Branch entered his personal car and drove away during those shifts— also in violation of the Temple Work Rules.

Branch, an African American male, argues that Defendants discriminated against him due to his race, retaliated against him for his complaints of race discrimination, and retaliated and interfered with his FMLA usage. Branch maintains that no engineer has ever been terminated for failing to sign logbooks and that other roving engineers, particularly white engineers, regularly failed to sign logbooks and were not terminated. Branch claims that Defendants went on a "witch hunt" to ultimately find any reason to terminate Branch's employment. Specifically, Branch alleges that on January 22, 2020—two days after Branch requested FMLA leave— Defendant Ounan conducted a random spot check of Branch's logbooks in order to justify his termination, even though the signing of logbooks was never enforced. To further support his

"witch hunt" theory, Branch points to the emails between Defendant Ounan, Defendant Boyle, and Temple Police after Branch was fired.  In those emails, Defendants Ounan and Boyle asked the Temple Police to check the security footage "to make sure he leaves campus. . . He was terminated today and we want to make sure all of our details are straight."  Branch also asserts that this attempt to find "evidence to corroborate" his termination was unsuccessful because the police footage revealed he stayed on campus on January 20, to which Defendant Ounan replied in an email, "that's not good."

To further support his allegations of discrimination, Plaintiff contends that he was "disciplined and then targeted for termination in a manner disparately from his Caucasian coworkers."  Specifically, Plaintiff alleges that Defendant, Ounan, harbored racial animus toward Branch and that Ounan disciplined African American engineers "for incidents which he routinely let white engineers slide."  For these assertions, Plaintiff relies on the testimony of two former engineering supervisors who worked directly under Ounan—Robert Iodice and Brian Flanagan. Robert Iodice, who served as a supervisor from July of 2017 to July 1, 2019, testified that he perceived "that there was certainly a maybe covert or unannounced level of discrimination, if not actual racism."  Furthermore, Iodice testified that "discipline" formed his perception of this belief, and that "I don't even know that Sean [Ounan] recognized that he acted that way as well. I think it might have been so subtle that he just liked white people better than he liked black people."  He also testified that Ounan "hated Stephen Branch."  Brian Flanagan, who served as a supervisor until 2014, testified that Ounan used racial slurs on two occasions.  First, Flanagan testified that Ounan said, "why are all these black guys making all this money? And you've got that fucking n[*****] Stephen Branch making all of this money" (altered by the Court to omit a

racial slur).  Flanagan further testified that Ounan said, in reference to Branch, "even though you won't write him up, Brian, we'll get that n[*****] one day" (same).

Defendant Ounan denies making any racist comments to Branch.  Defendants also argue that Flanagan and Iodice are not credible witnesses for multiple reasons.  First, Brian Flanagan was terminated for falsifying records, and the allegations date back more than five years before Branch was fired.  Second, Flanagan's certification has numerous errors—including the spelling of his own name and the dates of his employment.  Further, Defendants claim that Iodice's testimony is based on speculation, not actual first-hand knowledge, and point out that Iodice himself was fired for failing to issue discipline for violations for the Work Rules.

Branch also alleges that Bill Schweizer—the Steam & Chilled Water Plant Supervisor—once used a racial slur during a phone call, and that Branch's complaint about that remark was not fully investigated.  This allegation stems from an incident that occurred just after midnight on April 1, 2019.  Defendants allege that Branch failed to respond for nearly four hours to a critical temperature alarm that had gone off in a building for which Branch was responsible.  Schweizer called Branch, who Defendants allege became defensive and argumentative.  Defendants claim that that Schweizer ended the phone call by telling Branch to meet with him the next morning.  Branch contends that, at the end of this phone call, Schweizer said, "I hate you n[******]" (alteration by the Court) when ending the phone call.  Then, the very next day, on April 2, 2019, Ounan requested that Branch be terminated.  Schweizer denies making any such comment, and Defendants assert the Schweizer did not participate in any way in Branch's termination.  Defendants contend that Ounan requested for Branch to be terminated because he failed to respond to the alarm and that Branch's complaint was investigated and unsubstantiated.

## II.   **PROCEDURAL HISTORY**

4

Plaintiff first filed his Complaint against Defendants on May 18, 2020.  ECF No. 1.  In response to Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 4), Plaintiff filed an Amended Complaint on July 31, 2020.  ECF No. 5.  Defendants filed their Answer on August 28, 2020.  ECF No. 11.  By stipulation of the parties, Plaintiff then filed a Second Amended Complaint on September 16, 2020 (ECF No. 17), which Defendants Answered on October 1, 2020.  ECF No. 21.  Currently pending before the Court is Defendants' Motion for Summary Judgment on all of Plaintiff's claims (ECF No. 65), which has been fully brief and is ripe for disposition.  *See* ECF Nos. 71, 72, and 74.

## III.    JURISDICTION AND STANDARD OF REVIEW

The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.

Summary judgment is granted where the moving party has established "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that must be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Id.* at 248.

When ruling on a summary judgment motion, the court will consider the facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  The judge's role is not to weigh the disputed evidence and determine the truth of the matter, or to make credibility determinations; rather the court must determine

whether there is a genuine issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 249.  The summary judgment standard is "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues."  *Stewart v. Rutgers*, 120 F.3d 426, 431 (3d Cir. 1997).

IV.   **DISCUSSION**

Branch has filed claims against Defendants for race discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, and claims for FMLA interference and FMLA retaliation.  Defendants' motion seeks judgment in their favor on all Plaintiff's claims.

A.   **Title VII Discrimination**

Claims of race discrimination under Title VII and the Pennsylvania Human Rights Act ("PHRA") are governed by the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999); *Vaughan v. Boeing*, 733 F. App'x 617, 622 (3d Cir. 2018).

"Under this framework, the plaintiff must first carry the initial burden of establishing a prima facie case of discrimination."  *Norman v. Kmart Corp.*, 428 F. App'x 591, 592 (3d Cir. 2012).  To establish a *prima facie* case of racial discrimination, "[a] plaintiff must show that: (1) [he] is a member of a protected class, (2) [he] was qualified for the position [he] sought to attain or retain, (3) [he] suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."  *Robinson v. Nat'l R.R. Passenger Corp.*, No. 18-341, 2019 WL 3310333, at *9 (E.D. Pa. July 22, 2019) (Kenney, J.) (quoting *Vaughan*, 733 F. App'x at 622).

Next, if the plaintiff succeeds in establishing a prima facie claim, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.  The defendant satisfies this burden "by introducing evidence, which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable [action]." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Fuentes v. Perksie*, 32 F.3d 759, 734 (3d Cir. 1994)).  "The defendant need not prove that the tendered reason was the actual reason for its behavior." *Id.*

Finally, if the defendant articulates such a reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were pretext.  *Id.* at 804; *Vaughan*, 733 F. App'x at 622; *Jones*, 198 F.3d at 410.  A plaintiff can demonstrate pretext and defeat summary judgment by pointing to evidence from which a jury could reasonably "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Norman*, 485 F. App'x at 593 (quoting *Fuentes*, 32 F.3d at 764); *see also Burton v. Teleflex Inc.*, 707 F.3d 417, 430–31 (3d Cir. 2013).  "The plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Jones*, 198 F.3d at 413.  The plaintiff need not introduce evidence beyond his prima facie case, but must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to show that they were pretext.  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (quoting *Ezold v. Wolf*, 983 F.2d 509, 531(3d Cir. 1992)).

**1.  <u>Plaintiff's Prima Facie Case of Discrimination</u>**

First, Branch must establish a prima facie case of discrimination by showing (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Vaughan*, 733 F. App'x at 622.

The first three elements are not disputed here. The central focus of the fourth element is whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated employees outside the plaintiff's protected class. *See Smith v. Sec'y U.S. Navy*, 843 F. App'x 466, 469 (3d Cir. 2021); *May v. PNC Bank*, 434 F. Supp. 3d 284, 298 (E.D. Pa. 2020).

Establishing a prima facie case of discrimination under Title VII is not intended to be onerous and "poses a burden easily met." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008); *see also Scheidemantle*, 470 F.3d at 539 ("[T]here is a low bar for establishing a prima facie case of employment discrimination."); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (satisfying prima facie case and reasoning that plaintiff need not produce compelling evidence or conclusive proof that his employment termination resulted from age discrimination). For example, the Third Circuit in *Stewart* concluded the plaintiff established an inference of discrimination to sufficient to satisfy her prima facie burden by showing evidence that the employer departed from its normal procedural sequence when denying tenure to the plaintiff, an African American woman. 120 F.3d at 433–34. From this, the court reasoned, a jury may infer that the plaintiff's tenure denial stemmed from racial discrimination. *Id*. at 426.

Similarly, in *Williams v. Wells Fargo Financial Acceptance*, the court held that the employee, an African American male, established a prima facie case of discrimination when the company terminated 31 employees—30 of which were African American—for sending inappropriate emails, while non-African American employees engaged in the same conduct and were not terminated.  564 F. Supp. 2d 441, 443 (E.D. Pa. July 3, 2008).  Although the company's decision-makers denied such racially disparate treatment, the court concluded the questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof were all questions for the jury.  *Id*. at 447–49.

Here, Defendants challenge only the fourth element of the prima facie case of discrimination.  To satisfy the fourth element and support an inference of discrimination, Plaintiff contends that Defendant Ounan disciplined Branch, and other African American engineers, in a disparate manner from his Caucasian coworkers.  Branch relies on the testimony of Iodice who testified, "[m]y perception was that there was certainly a maybe covert or unannounced level of discrimination, if not actual racism, that I perceived."  Ex. E.  Iodice also speculated that Ounan "liked white people better than he liked black people."  *Id.*  Branch also relies on the testimony of Flanagan, who alleged that Ounan used a racial slur on two occasions when talking about Branch.  Ex. L.  When Plaintiff made a complaint to both Temple's EEO and the EEOC, the next day, Defendant Ounan issued at least ten disciplinary forms for excessive sick days, which Plaintiff alleges was "for self-serving purposes in order to create the appearance of fair treatment."  *Id.*

Defendants contend that the record shows Ounan expected all engineers to abide by the Temple Work Rules and repeatedly instructed his direct reports to enforce the Work Rules.  The record also shows that Iodice sent numerous emails to his direct reports, including Branch,

reminding them that they are expected to use LogCheck regularly.  Furthermore, Defendants assert that Branch is incorrect in claiming that Krol and Turgeon (Caucasian coworkers) were not disciplined because the record shows both Krol and Turgeon were in fact disciplined, and Turgeon was ultimately terminated for violating the Work Rules.

Here, the Court finds that a reasonable jury could find that Branch has established a prima facie case of race discrimination.  It is undisputed that he is a member of a protected class being an African American male, was qualified as a roving engineer, and suffered an adverse employment action.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (defining an adverse employment action as "a significant change in employment status such as hiring, firing, failing to promote . . . .").  The Court also finds that Branch has presented sufficient evidence creating genuine issues of material fact such that a reasonable jury could find that his termination occurred under circumstances giving rise to an inference of intentional discrimination.  *See Jones*, 198 F.3d at 410.

Because summary judgment requires the Court to draw all reasonable inferences in the non-moving party's favor, the Court will not make credibility determinations as to the testimony of Robert Iodice and Brian Flanagan.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Flanagan and Iodice make serious allegations of the use of racial slurs and racism by Defendants, which viewed in the light most favorable to the Branch, demonstrate an inference of intentional discrimination in violation of Title VII.  *See Anderson*, 621 F.3d at 271; *Scheidemantle*, 470 F.3d at 538.  Although Defendants' credibility concerns regarding the testimonies of Iodice and Flanagan may be valid, these determinations are for the jury and cannot be made at the summary judgment stage.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Williams*, 564 F. Supp. 2d at 447.

Furthermore, a jury could reasonably conclude that Defendants treated Branch in a disparate manner from his Caucasian coworkers because Defendant Ounan testified that he did not know of any engineer who has been recommended for discipline or termination for failure to sign the logbooks besides Branch. *See Stewart*, 120 F.3d at 426. In addition, two supervisors, Iodice and Schweizer, testified that signing logbooks was not enforced.

Viewing these facts and drawing all inferences in favor of the non-moving party, Plaintiff has presented sufficient evidence to state a prima facie case of race discrimination to survive Defendants' summary judgment motion. The Court will move on to consider whether Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination.

### 2. <u>Defendants' Legitimate, Nondiscriminatory Reason for Plaintiff's Termination</u>

As a jury could find that Plaintiff established a prima facie case of discrimination, the burden shifts to the Defendants to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

The Court finds that Defendants have articulated legitimate, nondiscriminatory reasons for Branch's termination, and have thus satisfied the second prong of the burden-shifting framework. Defendants have put forth evidence that Branch violated numerous Work Rules by leaving campus without permission, failing to sign 23 of 24 logbooks for three consecutive shifts, and insubordination. These violations suffice as legitimate, nondiscriminatory reasons for termination, which have no relation to Branch's race, because Temple's Work Rules specify that failing to sign log books is a terminable offense. *See Norman*, 485 F. App'x at 593 (finding

employee's manipulation of payroll records and fraudulent behavior were legitimate reasons for termination unrelated to employee's age); *Reeves*, 530 U.S. at 142 (finding employee's failure to follow work rules and keep accurate records amounted to legitimate reason for termination).

The Court finds that Defendants have articulated a legitimate and nondiscriminatory reason for terminating Plaintiff.  Therefore, the burden shifts back to Plaintiff to show that Defendants' proffered reason is pretext for discrimination.

### 3.  <u>Plaintiff's Showing that Defendants' Nondiscriminatory Reasons are Pretextual</u>

The third step of the *McDonnell Douglas* framework requires Branch to prove, by a preponderance of evidence, that Defendants' legitimate, nondiscriminatory reasons were "not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410.  To defeat summary judgment, Branch can demonstrate pretext by pointing to evidence from which a jury could reasonably "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Norman*, 485 F. App'x at 593 (quoting *Fuentes*, 32 F.3d at 764).

The Third Circuit provided further explanation of this third prong in *Simpson*:  "[t]he plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class."  *Simpson*, 142 F.3d at 645.  "[T]he prima facie case and pretext inquiries often overlap…. [E]vidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other."  *C.A.R.S. Prot. Plus*, 527 F.3d at 370.

Plaintiffs must provide evidence beyond their own subjective belief of discrimination to show pretext for racial discrimination.  *See Jones*, 198 F.3d at 414; *Williams*, 564 F. Supp. 2d at 451.  For instance, in *Jones*, the Third Circuit affirmed summary judgment for the employer and concluded there was insufficient evidence of pretext because the terminated teacher's allegations of racial discrimination were predicated "on nothing more than his beliefs without having actual knowledge of them."  198 F.3d at 414.  Similarly, the court in *Murrell* granted summary judgment for the employer, finding no evidence of pretext for the employer's decision to terminate the plaintiff.  2019 WL 2177911, at *6.  The plaintiff alleged that she had "a feeling" there was discrimination against her but cited no reason or motivation that her employer would have to terminate the plaintiff for her disability.  *Id.*  The plaintiff simply denied the employer's reasons for terminations, which the court rejected because a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." *Id.*; *Fuentes*, 32 F.3d at 765.

Because discriminatory conduct is often subtle and difficult to prove, the Third Circuit has instructed district courts not to weigh the credibility of competing testimony on a motion for summary judgment.  *See Weldon v. Kraft*, 896 F.32d 793, 800 (3d Cir. 1990); *Jackson v. Univ. of Pittsburgh*, 836 F.2d 230, 236 (3d Cir. 1987); *Graham v. F.B. Leopold Co., Inc.*, 779 F.2d 170, 173 (3d Cir. 1985).  For instance, in *Weldon*, the court maintained that uncorroborated deposition testimony may create a genuine issue of fact on the question of discriminatory intent.  896 F.2d at 800.  In that case, the plaintiff, an African-American employee, testified that he was unfairly assigned to one of the toughest managers who had a history of difficulty with African-American employees.  *Id*. at 799.  The Third Circuit, reversing District Court's grant of summary judgment to the employer, concluded the plaintiff's testimony could support an inference of pretext and

reasoned that there is no rule of law that the testimony of a plaintiff, standing alone, cannot make out a case of discrimination to survive summary judgment. *Id.*

The Third Circuit has also recognized that proof of a discriminatory atmosphere may be relevant—but is not dispositive—in showing pretext because such evidence "does tend to add color to the employer's decision making processes and to the influences behind the actions taken with respect to the individual plaintiff." *Ezold v. Wolf*, 983 F.2d 509, 546 (3d Cir. 1992). The plaintiff in *Ezold* alleged sex discrimination when she was not promoted and relied on several sexist comments by a male partner at the law firm to show that her denial of promotion was likely the result of discriminatory bias. *Id*. at 547. The court rejected such claims and held that several stray remarks by a non-decisionmaker, over a period of five years, while inappropriate, were insufficient to show that a discriminatory bias more likely motivated the Defendant's promotion decision than its articulated reason. *Id.*

In the present case, Defendants contend that Plaintiff cannot meet his burden to demonstrate pretext because they claim (1) record evidence, including Branch's own admissions, establishes that Branch did not sign the log books in all of the buildings to which was assigned on January 19, 20, and 21; (2) video evidence shows Branch driving away from campus on January 21, 2020 and not returning until hours later; and (3) Temple honestly believed Branch left campus without permission, and pretext does not address the correctness of the reasons offered for employment decisions.

Plaintiff's evidence that Defendants' decisions were made with "discriminatory animus" is similar to his evidence supporting the fourth prong of his prima facie case of discrimination under the *McDonnell Douglas* framework. Plaintiff asserts that the record evidence shows that in the days following Branch's requests to take FMLA leave, and after his multiple complaints of

race discrimination to Temple's EEO and EEOC and filing multiple grievances, Defendant

Ounan went on a "witch hunt" looking for any reason to terminate Branch.  Plaintiff relies

heavily on the testimony of both Robert Iodice and Brian Flanagan to show that Defendant

Ounan was motivated by race and also treats African-American engineers worse than white

engineers.

Plaintiff also points to evidence following Branch's termination in which Defendants

continued to ask the Temple police to review security footage.  Ounan wrote to the police, "[c]an

you please look back at those days to make sure he leaves campus . . . He was terminated today

and we want to make sure all of our details are straight."  Plaintiff claims this "witch hunt" for

evidence demonstrates Defendants' reasons for termination were pretextual.

The Court finds that Plaintiff has met his burden to show a genuine factual dispute or that

a jury could reasonably believe that Defendants' reasons for firing him are pretextual.  Plaintiff

has proffered evidence from which a jury could reasonably infer the Defendants selectively

enforced its Work Rules against Plaintiff in a discriminatory manner.  Like the plaintiff in

*Williams*, who presented testimony that it was common to violate some company policies

without being terminated, Branch has provided testimony evidence by Defendant Ounan himself

revealing that he did not know of any other employee other than Branch being terminated for

failing to sign logbooks even though other employees failed to sign them.  *See* 564 F. Supp. 2d at

451.  Further, Iodice and Schweizer both testified that logbook signing was not enforced, and a

reasonable jury could find that this selective enforcement against Branch is sufficient evidence

that the reasons given for his termination were pretextual.  *See Weldon*, 896 F.2d at 798.

Plaintiff has also provided testimony of a former supervisor, Brian Flanagan, who alleged

that Defendant Ounan used a racial slur on two occasions when speaking about Branch.

15

Although Defendants deny this statement and point to credibility issues in Flanagan's testimony, these credibility determinations are for the jury to decide and therefore inappropriate for summary judgment. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Anderson*, 621 F.3d at 271; *Scheidemantle*, 470 F.3d at 538.

The present case is distinguishable from *Ezold*, where the Third Circuit held that offensive stray remarks by non-decisions maker were insufficient to show pretext. *See* 983 F.2d at 547*; see also Foster v. New Castle Area Sch. Dist.*, 98 F. App'x 85, 87 (3d Cir. 2004) ("[D]iscriminatory statements . . . made by non-decision-makers or individuals who played no part in the decision are inadequate to support an inference of discrimination"). Here, Defendant Ounan played an active role in Branch's termination by performing the spot check of Branch's logbooks, which led to Branch's termination, and by working with Temple police to obtain security footage of Branch getting into his car during his shift. Defendants' claim that Ounan was not a decisionmaker is unsupported by the current record. As such, Plaintiff's allegations that Ounan called Branch a racial slur on two occasion support the Court's finding a jury could reasonably conclude that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Norman*, 485 F. App'x at 593; *Fuentes*, 32 F.3d at 764.

**B.  Title VII Retaliation**

Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter." 42 U.S.C. § 2000e-3(a).

The procedural framework in retaliation cases also follows the burden-shifting *McDonnell Douglas* framework of Title VII discrimination cases. *Moore v. City of Phila.*, 461 F.3d 331, 341–42 (3d Cir. 2006); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995). Under this framework, the plaintiff must first establish a prima facie case of retaliation. *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 95 (3d Cir. 2016); *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014). If the plaintiff succeeds in establishing a prima face case of retaliation, the burden shifts back to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. *Young*, 651 F. App'x at 95. If the defendant satisfies this burden of production, the burden shifts back to plaintiff to prove, by a preponderance of evidence, that the articulated reason was pretext for retaliation. *Id.*

In the present case, Plaintiff claims Defendants violated Title VII by retaliating against him in response to his complaints of racial discrimination. Defendants have moved for summary judgment and argue that Plaintiff's protected activity, namely his EEOC charge, was too temporally remote from his termination to be considered causally linked. When viewing the facts in a light most favorable to Branch, the Court finds that genuine issues of material fact exist to preclude summary judgment on Branch's Title VII retaliation claims.

### 1. **Plaintiff's Prima Facie Case of Retaliation**

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in activity protected by Title VII; (2) the employer took adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore*, 461 F.3d at 340; *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997). At the prima facie stage, the plaintiff need only proffer evidence to

show that his engagement in protected activity was the likely reason for the adverse employment action. *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 253 (3d Cir. 2017).

The parties do not dispute that Branch's EEOC filing was a protected activity under Title VII and that Defendants took an adverse action against Branch by terminating him. Defendants assert, however, that Branch does not meet the causation element of a prima facie case of retaliation because the record is devoid of evidence from which a reasonable jury could find the requisite causal link between Branch's protected activity and his termination.

A plaintiff may rely on a "broad array of evidence" to demonstrate the causal link between the protected activity and the adverse employment action taken. *Carvalho-Grevious*, 851 F.3d at 260. The plaintiff can establish causation "by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of a retaliatory motive.'" *Id.* (quoting *Shaner v. Synthes*, 204 F.3d 494, 503 (3d Cir. 2000)). This list is not exclusive, and the proffered evidence, taken as a whole, may suffice to show causation. *Kachmar v. SunGard Data Sys*, 109 F.3d 173, 177 (3d Cir. 1997).

The Third Circuit has established that temporal proximity between the protected activity and the termination is sufficient to establish a causal link, but also that "the mere passage of time is not legally conclusive proof against retaliation." *Robinson v. SEPTA*, 982 F.2d 892, 894 (3d Cir. 1993); *see also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). In *Robinson*, during the two years that passed between the employee's complaint of racial discrimination and the employee's discharge, the defendants subjected the plaintiff to a "constant barrage of written and verbal warnings …, inaccurate point totalings, and disciplinary action." 982 F.2d at 894–95. The Third Circuit concluded this pattern of antagonism in the intervening

18

pattern sufficed to establish a causal link between the plaintiff's protected conduct and subsequent discharge. *Id.* at 895–97.

Here, Branch filed a complaint of racial discrimination on June 11, 2019 with the Equal Employment Opportunity Commission.  Defendants assert that the seven months between Plaintiff's EEOC charge and termination is too long a duration to show a causal connection through temporal proximity, and thus Plaintiff cannot establish a prima facie case of discrimination.  Even if Plaintiff establishes a prima facie case, Defendants maintain that Temple terminated Branch for legitimate violations, and that complaints of discrimination before committing these infractions do not insulate him from disciplinary action.  Defendants also point to the fact that Defendant Ounan recommended Branch for termination before Branch made complaints of discrimination, which demonstrates that Branch's termination was not pretext for retaliation.

Plaintiff disputes Defendants' claim that Branch's sole protected activity was his June 11, 2019 EEOC charge.  Plaintiff contends that Branch's engaged in many protected activities, including (1) a written complaint on June 29, 2018 to Defendant Ounan regarding Ounan's disparate treatment of his approved FMLA usage; (2) a written complaint to Ounan on April 1, 2019 when Schweizer said to Branch, "I hate you n[\*\*\*\*\*\*]" (alteration by the Court) during a phone call; (3) multiple emails beginning on April 30, 2019 complaining of race discrimination to Defendant Boyle; (4) an EEOC charge on June 11, 2019 naming Defendant Ounan; and (5) multiple grievances against Ounan relating to discipline, resulting in a grievance hearing on August 28, 2019, ultimately resolved on October 4, 2019.

Viewing the allegations in the light most favorable to Branch, the Court finds that Branch engaged in multiple protected activities—not only his EEOC charge on June 11, 2019.  In

addition to his complaints to the EEOC, Branch's written complaints and emails to supervisors of racial discrimination are considered protected activity under Title VII. *See Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 139 (E.D. Pa. 2020); *Mufti v. Aarsand & Co.*, 667. F. Supp. 2d 535, 552 (W.D. Pa. 2009) ("Protected activity includes formal charges of discrimination as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.").

Plaintiff claims there is temporal proximity, and thus a causal link, between his April 1, 2019 complaint to Defendant Ounan—where he alleged Schweizer said, "I hate you n[******]" during a phone call—and Defendant's Ounan request on April 2, 2019 that Branch be terminated. Defendants assert that Ounan's request to terminate Branch was based on Branch's failure to respond to a critical alarm system for nearly four hours on the night of April 1, 2019.

Defendant Ounan was interviewed on June 25, 2019 as part of Temple's investigation of Branch's claims of racial discrimination. The next day, June 26, 2019, Defendant Ounan issued at least ten disciplines to white employees, which Plaintiff claims was "in order to make it appear that he was not racist." On June 11, 2019, Branch filed an EEOC charge naming Defendant Ounan, and then continued to file multiple grievances against Ounan relating to disparate discipline, resulting in a grievance hearing on August 28, 2019 and ultimately resolved on October 4, 2019.

Viewing the evidence in a light most favorable to Branch, the Court finds that the timing of Ounan's alleged retaliatory action on April 2, 2019—one day after Branch complained of a racial slur—to be "unusually suggestive of a retaliatory motive." *Williams v. Phila. Hous. Auth.*

*Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004).  Considering Ounan suggested termination the day after Branch's complaint of a racial slur, as opposed to months, there is sufficient evidence that a jury could reasonably find a causal link between Branch's protected activity and retaliation.  *See McLaughlin v. Fisher*, 277 F. App'x 207, 218-19 (3d Cir. 2008) (noting that two days is unusually suggestive, but three months is not).  Although Defendants maintain that Ounan recommended termination because Branch failed to respond to a critical alarm, and not because of Branch's complaint, the Court cannot make these determinations at summary judgment because they are issues of fact that a jury must resolve.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Anderson*, 477 U.S. at 249.

Furthermore, although Defendants argue that the seven months from Branch's EEOC charge to his actual termination is too long to suggest a temporal causal linkage, the Third Circuit has held that "the mere passage of time is not legally conclusive proof against retaliation."  *Robinson*, 982 F.2d at 894; *Aman*, 85 F.3d at 1085.  Similar to the plaintiff in *Robinson*, who was subjected to a period of antagonism between his complaints of racial discrimination and subsequent discharge, Branch claims that he was subjected to discipline and a "witch hunt" following his protected activity where Defendants searched for any reason to terminate Branch.  *See* 982 F.2d at 894.  This pattern of antagonism, like in *Robinson*, is sufficient to establish a causal link between Branch's protected activities and termination. *See id.* at 895.

Therefore, the Court finds that Branch has sufficiently established a prima facie case of retaliation under Title VII to survive this motion for summary judgment.

### a. <u>Defendants' Legitimate, Nonretaliatory Reason</u>

Because a reasonable jury could find that Plaintiff has established a prima facie case of retaliation under Title VII, the burden shifts to the Defendants to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.  Defendants maintain that Branch was terminated for insubordination, failing to sign logbooks, and leaving campus during his shift without permission.

These violations suffice as legitimate, nondiscriminatory reasons for termination, which have no relation to Branch's protected activity, because Temple's Work Rules specify that failing to sign log books is a terminable offense.  *See Norman*, 485 F. App'x  at 593 (finding employee's manipulation of payroll records and fraudulent behavior were legitimate reasons for termination unrelated to employee's age); *Reeves*, 530 U.S. at 142 (finding employee's failure to follow work rules and keep accurate records amounted to legitimate reason for termination).

The Court finds that Defendants have articulated a legitimate and nondiscriminatory reason for terminating Plaintiff.  Therefore, the burden shifts to Plaintiff to show that Defendants' proffered reason is pretext for retaliation.

**b.  <u>Plaintiff Must Show Defendants' Reason is Pretext</u>**

After the defendant provides a legitimate, non-retaliatory reason for its conduct, the burden shifts back to the plaintiff to convince the factfinder that the employer's proffered reasons were pretext and that retaliation was the real reason for the adverse employment action.  *Moore*, 461 F.3d at 341.  The plaintiff must "convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Young*, 651 F. App'x at 95; *Moore*, 461 F.3d at 342.  The plaintiff must prove that his employer's retaliatory animus was the "real reason" for the adverse employment action.  *Young*,

651 F. App'x at 95; *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) (using term "real reason" to describe plaintiff's burden at pretext stage).

A plaintiff must address causation at both the prima facie and pretext stages, but the standard for causation at each stage differs. *Farrell*, 206 F.3d at 286. To establish causation at the prima facie stage, the plaintiff may rely on a broad array of evidence to demonstrate a causal link between the protected activity. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). For example, the plaintiff may produce evidence of temporal proximity between the adverse action and protective activity, or the plaintiff may rely on evidence of "intervening antagonism" to support the interference of retaliatory animus. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232-33 (3d Cir. 2007). In contrast, to prove causation at the pretext stage, the plaintiff must show that [he] would not have suffered an adverse employment action 'but for' [his] protected activity." *Young*, 651 F. App'x at 96; *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)."). For example, in *Young*, the Third Circuit concluded the plaintiff failed to show that the employer's reasons for her termination—violating company policies—were pretextual, and that retaliation of her EEOC charge was the real reason for her termination. 651 F. App'x at 99. The court reasoned that the plaintiff only presented general allegations about two comparators who received less discipline for similar infractions, which was insufficient to cast doubt on the employer's reasons for her termination. *Id*. Similarly, in *Smith*, the Third Circuit affirmed the district court's finding that the plaintiff failed to show that defendant's reasons for termination were pretext for retaliation. 843 F. App'x at 470. The court reasoned that the defendant was looking into terminating the plaintiff well before he filed an EEO complaint, which undermined

his argument that the reasons given in the termination were pretextual.  *Id.*  The court further reasoned that the plaintiff failed to point to any evidence in the record to show that his EEO complaint motivated the employer to comb through his record to justify his termination.  *Id.*

Here, Defendants assert that Branch cannot show pretext because Ounan had recommended Branch for termination well before he ever made any complaints of discrimination.  Specifically, on January 30, 2019 Defendant Ounan recommended Branch for termination because he had "been late for work 14 times since July 1, 2018" which "is past the amount that work would have required termination."

Plaintiff argues that Defendants' reasons for his termination were pretextual because Defendant Ounan requested Branch's termination the day after Branch complained that Schweizer referred to him using a racial slur.  Then, when asked in his deposition why Branch was not terminated as Defendant Ounan requested, Defendant Ounan claimed that the termination "wouldn't hold up under a grievance."  Three days later, on April 12, 2019, Defendant Ounan then emailed human resources three "Excessive Lateness" discipline forms all dated April 12, 2019.  Plaintiff alleges this was done so Defendant Ounan could show Branch was provided "progressive discipline."

On May 20, 2019 Plaintiff, via email, requested a formal EEO investigation into his complaints of discrimination.  In addition, Plaintiff filed a Charge of Discrimination based on his race and retaliation with the EEOC and Pennsylvania Human Rights Commission on June 11, 2019.  Plaintiff acknowledges that his complaints were the first time Defendant Ounan had been accused of race discrimination.  Defendant Ounan was interviewed on June 25, 2019 in connection with Branch's complaints of race discrimination, and the day after on June 26, 2019,

Defendant Ounan issued ten disciplinary forms for excessive sick days to all white engineers. Plaintiff argues that this was a fabricated attempt to show equal enforcement of work rules.

The Court finds that Branch has provided enough evidence to show that Defendants' purported reasons for termination were pretextual for retaliation.  Although Defendant Ounan requested Branch be terminated before Branch made complaints to the EEOC and EEO, exactly like the employer in *Smith* who recommended the employee's termination well before he filed a complaint with EEO, the present case is distinguishable.  *See* 843 F. App'x at 470.  Here, unlike in *Smith*, Branch has pointed to record evidence where Defendant Ounan issued discipline to Branch just a few days following his complaints of racial discrimination, and also to questionable discipline issued to white engineers after his interview in connection with such discrimination.  *Id.*  Furthermore, Branch has alleged that after he made such complaints of discrimination, Ounan engaged in a "witch hunt" to find any reason to fire him.  Therefore, Branch has shown a genuine issue of material fact that "but-for" his protected activity, he would not have been terminated.  *See Young*, 651 F. App'x at 96.

For these reasons, Defendants' motion for summary judgment against Branch's Title VII Retaliation claim is denied.

### C.  **FMLA Claims**

Plaintiff also brings FMLA interference and FMLA retaliation claims against Defendants. Defendants have moved for summary judgment on both claims.  For the reasons below, Defendants' motion for summary judgment against Branch's FMLA claims will be denied.

The FMLA aims to "balance the needs of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1)-(2); *see also Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005).  The FMLA attempts to

accomplish these purposes "in a manner that accommodates the legitimate interests of employers."  29 U.S.C. § 2601(b)(3).

The Third Circuit has established that "when employees invoke grants under the FMLA, employers may not 'interfere with, restrain, or deny the exercise of or attempt to exercise these rights.'  Nor may employers 'discharge or in any other manner discriminate against an individual for opposing any practice made unlawful.'" *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012) (quoting 29 U.S.C. § 2615(a)(1)-(2)); *see also* 29 C.F.R. § 825.220(c).  The former provision is referred to as "interference," whereas the latter is referred to as "retaliation."  *Callison*, 430 F.3d at 119.  Employers are barred from considering an employee's FMLA leave as a negative factor in employment actions such as hiring, promotions, or disciplinary actions.  *Lichtenstein*, 691 F.3d at 301.  "Accordingly, an employee need not prove that invoking FMLA rights was the sole or most important factor upon which the employer acted."  *Id.*

### 1.  Interference

To establish an interference claim under the FMLA, a plaintiff must establish: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."  *Ross*, 755 F.3d at 191–92.  Because the FMLA interference claim does not concern discrimination, a *McDonnell Douglas* burden-shifting analysis is not required.  *Sommer v. Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006).

After a period of FMLA leave, employees are entitled to reinstatement to their former position or an equivalent one with equivalent employment benefits, pay, and other terms and

conditions of employment.  *Sommer*, 461 F.3d at 399.  For example, the Third Circuit in *Dilorio v. Manor* held that the FMLA mandates employers to restore employees to their prior position with equivalent opportunities for overtime.  315 F. App'x 115, 118 (3d Cir. 2009).  The court applied the Department of Labor's regulation that defines an "equivalent position" as a position that entitles a person to a similar amount of overtime work upon return from FMLA leave as was available to that person before the FMLA leave.  *See id*.; 29 C.F.R. § 825.215(c)(1) ("If an employee departed from a position averaging ten hours of overtime (and corresponding overtime pay) each week, an employee is ordinarily entitled to such a position on return from FMLA leave.").  In the *Dilorio* case, the employer offered opportunities to work overtime according to a rotating list where new hires and persons returning from leave were placed on the bottom of the list.  319 F. App'x at 116–17.  Ultimately, the Third Circuit in *Dilorio* rejected the employee's contention that his poor placement on the overtime list interfered with his rights under FMLA because he was had the same opportunities for overtime as he did prior to taking the leave.  *Id*. at 118.

Furthermore, 29 C.F.R. § 825.204(a) permits the employer to transfer the employee taking leave temporarily "to an available alternative position for which the employee is qualified and which better accommodates recurring periods of leave then does the employee's regular position."  However, this permission is subject to limitations.  For instance, "[a]n employer may not transfer the employee to an alternative position in order to discourage the employee from taking leave or otherwise work a hardship on the employee."  § 825.204(d).  The regulation lists examples of this limitation, including: "a white collar employee may not be assigned to perform laborer's work; an employee working the day shift may not be reassigned to the graveyard shift;

an employee working in the headquarters facility may not be reassigned to a branch a significant distance away from the employee's normal job location." *Id.*

In the present case, it is undisputed that Branch was entitled to the benefits of the FMLA. Accordingly, only the fifth element of an interference claim is at issue—whether Defendants denied Branch of his entitlements under the FMLA.

Plaintiff alleges that Defendants interfered with his use of FMLA by prohibiting his ability to work overtime and forcing him to withdraw his FMLA leave request. Branch was approved for intermittent FMLA leave due to his children's health conditions. To continue to use his approved FMLA leave, Plaintiff alleges that in June/July 2018 Defendants forced him to switch from third shift (11:00 PM to 7:00 AM) to first shift (7:00 A.M. to 3:00 P.M), which he could not work due to childcare issues, and was not permitted to work overtime. On July 2, 2020, Defendant Ounan informed Branch that, although he was now eligible for overtime, "if you do not report you are subject to the appropriate discipline." As a result, Plaintiff responded, "I guess I am forced to cancel my fmla . . ." Plaintiff is claiming interference of FMLA benefits for the time period when he was not allowed to work overtime.

Defendants reject Plaintiff's interference claims and contend that there is no evidence that Temple forced Branch to withdraw his FMLA request. Defendants maintain that Branch was never denied overtime, and Ounan appropriately reminded Branch that, if he signed up for overtime shifts, he must report or be "subject to the appropriate discipline."

Defendants assert that Plaintiff, when taking intermittent FMLA leave, often called out of work shortly before the start of his overnight shifts, which caused a disruption to operations and the ability to maintain necessary and safe coverage on campus at night. In order to accommodate Branch so he could call out on short notice to care for his children, and to ensure that Temple had

necessary coverage, Temple recommended that Branch was moved to the first shift (7:00 A.M. to 3:00 P.M.).

After learning that Temple intended to change his shift, Branch withdrew his request for FMLA leave.  In his withdrawal email, Branch acknowledged that his absence from work caused issues with on-site coverage but claimed that the third shift was the only shift that allowed him to have work/life balance needed to manage job and family responsibilities.

Defendants maintain that they did not interfere with Branch's FMLA rights or discourage him from taking leave by proposing a shift change.  The shift change did not prevent Branch from taking FMLA leave because he could have worked during the day and called out shortly before his shift for FMLA leave without disrupting operations.  Defendants also maintain that the real reason Branch withdrew his FMLA request was to work at his second job, Main Line Health, during the day.

Viewing the evidence in the light most favorable to Branch, the Court finds that there are genuine issues of material fact precluding summary judgment on Plaintiff's FMLA interference claim.  Although Defendants contend that Temple had a legal right to transfer Branch to an alternate position, Defendants "may not transfer the employee to an alternative position in order to discourage the employee from taking leave or otherwise work a hardship on the employee." *See* § 825.204(a), (d).  Viewing the evidence in Branch's favor, such change to Branch's schedule would interfere with Branch's ability to care for his children during the day and therefore constitute a hardship, violating the FMLA.  *Id*.

Furthermore, there are genuine issues of fact regarding whether Branch was denied the opportunity to work overtime as a result of taking FMLA.  Defendants assert that Plaintiff was never denied overtime, but Plaintiff maintains that his proposed shift change, to accommodate

his FMLA, prevented him from taking overtime.  Under the FMLA and 29 C.F.R. §

825.215(c)(1), Branch is entitled to the same opportunity for overtime work as was available to

him prior to taking FMLA leave.  *See Dilorio*, 319 F. App'x at 118.  Therefore, a reasonable jury

could conclude that by switching Branch to first shift, which prevented him from working

overtime, Defendants interfered with his FMLA rights.  *Id*.

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's

FMLA interference claim is denied.

### 2.  **FMLA Retaliation**

FMLA retaliation claims based on circumstantial evidence are assessed under the

*McDonnell Douglas* burden-shifting framework.  *Lichtenstein*, 691 F.3d at 302; *Budhun v.*

*Reading Hosp. & Med. Ctr.*, 765 F.3d at 256.  Under such framework, the plaintiff must first

establish a prima face case of retaliation by showing that: (1) he invoked his right to FMLA

leave, (2) he suffered an adverse employment action, and (3) the adverse action was causally

related to his invocation of FMLA leave.  *Lichtenstein*, 691 F.3d at 302.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to

provide evidence of a legitimate, non-discriminatory reason for the adverse action.  *McDonnell*

*Douglas*, 411 U.S. at 802.  If the employer satisfies this "minimal burden," the employee must

then proffer evidence that the defendant's reasons for the adverse action are pretextual.

*Lichtenstein*, 691 F.3d at 302.

### a.  **Plaintiff's Prima Facie Case of Retaliation**

To prevail on a FMLA retaliation claim, Branch must first establish a prima face case of

retaliation by showing that: (1) he invoked his right to FMLA leave, (2) he suffered an adverse

employment action, and (3) the adverse action was causally related to his invocation of FMLA

leave.  *Lichtenstein*, 691 F.3d at 302.  The parties contest only the third element of Branch's

prima facie case—that Branch's termination was causally related to his invocation of FMLA.

 The Third Circuit has articulated two factors relevant to the analysis of establishing a

causal link between the adverse employment action and the FMLA leave: (1) showing temporal

proximity between the protected activity and the adverse action or (2) evidence of ongoing

antagonism toward the employee.  *See Capps v. Mondelez Global LLC*, 147 F. Supp. 3d 327, 336

(E.D. Pa. 2015), *aff'd*, *Capps*, 847 F.3d 144, 155 (3d Cir. 2017); *Williams*, 380 F.3d at 760; *see*

*also Budhun*, 765 F.3d at 258 ("To demonstrate a causal connection, a plaintiff generally must

show 'either (1) an unusually suggestive temporal proximity between the protected activity and

the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a

causal link.'").  However, "the timing of the alleged retaliatory action must be unusually

suggestive of retaliatory motive before a causal link will be inferred."  *Williams*, 380 F.3d at 760.

 The Third Circuit has found that a temporal proximity of a few days, rather than months,

is unusually suggestive of causation.  *See Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d

Cir. 2014); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment

when plaintiff was fired two days after employer received notice of EEOC complaint); *see also*

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (instructing that where

temporal proximity is not unduly suggestive, the appropriate test is "timing plus other

evidence"); *LeBoon*, 503 F.3d at 233 (three months is not unusually suggestive); *Williams*, 380

F.3d at 760 (two months is not unusually suggestive); *Thomas v. Town of Hammonton*, 351 F.3d

109, 114 (3d Cir. 2003) (finding temporal proximity not unduly suggestive when three weeks

passed between protected activity and adverse employment action).

Even if the temporal proximity is not unduly suggestive, courts may still infer causation if the plaintiff shows evidence that the defendant "engaged in a pattern of antagonism in the intervening period." *Capps*, 147 F. Supp. 3d at 337.  For instance, the Third Circuit in *Abramson v. William Paterson College of New Jersey* concluded the plaintiff, an Orthodox Jew professor, presented significant evidence of ongoing antagonism from her supervisors to establish a causal connection between her protected activity and termination.  260 F.3d at 280–81.  Specifically, the plaintiff's supervisors yelled at her about how they were tired of her absences and scheduling conflicts due to Jewish holidays, and they also reprimanded at her for not attending faculty meetings that were moved to Friday nights and Saturday, which the supervisors knew the plaintiff could not attend due to Sabbath.  *Id.* at 269–71.

Similarly, the Third Circuit in *Lichtenstein* concluded that, in addition to an unduly suggestive temporal proximity, there was enough circumstantial evidence that a reasonable jury could infer causation.  691 F.3d at 308.  In the *Lichtenstein* case, when the plaintiff's supervisor learned of the plaintiff's FMLA absence, the supervisor immediately requested the plaintiff's records where she called out of work and ultimately made the decision that day to terminate the plaintiff, even though the termination did not occur until a few days later.  *Id.*  From this, the Third Circuit concluded a reasonable jury could infer causation between the plaintiff's FMLA leave and termination, even though there was a seven day gap between the protected activity and termination.  *Id.* at 307.

Here, on January 15 and January 20, 2020, Branch notified Ounan that he would be using his approved FMLA leave.  On January 22, two days after Branch requested to use his approved intermittent FMLA leave, Plaintiff alleges Ounan engaged in a "witch hunt" to find any reason to terminate Branch.  Specifically, Defendant Ounan conducted a "spot check" of the Branch's

assigned log books and found that Branch failed to sign 23 of his 24 logbooks for three consecutive nights, which resulted in his termination on January 29, 2020.

Viewing the evidence in the light most favorable to Branch, the Court finds that a reasonable jury could conclude that Branch has established a prima facie case of FMLA retaliation.  The first two elements are not in dispute, and Branch has provided enough evidence to create genuine issues of material fact and preclude Defendants' motion for summary judgment.

Although Branch was terminated nine days after his protected activity, as opposed to two days like in *Blakney*, which the Third Circuit found unduly suggestive, a reasonable jury could still find causation through "a pattern of antagonism coupled with timing to establish a causal link."  *See Blakney*, 559 F. App'x at 186; *Lichtenstein*, 691 F.3d at 308.  The present case is nearly identical to *Lichtenstein*, where the Third Circuit concluded there was sufficient evidence of causation between the plaintiff's termination and protected activity when the supervisor immediately investigated the plaintiff's call-out records after learning of the plaintiff's FMLA absence.  *See* 691 F.3d at 307.  Similarly, here, a reasonable jury may conclude that Ounan's decision to check all of Branch's logbooks two days after he took FMLA leave, which led to his termination, constituted a period of antagonism directly stemming from Branch's protected activity.  *See id*.

The Court therefore finds that Branch has sufficiently established a prima facie case of FMLA retaliation to survive summary judgment.

**b.  Defendants' Legitimate, Nonretaliatory Reason for Termination**

Because a jury could find that Branch has established a prima facie case of FMLA retaliation, the burden now shifts to the Defendants to provide a legitimate, nonretaliatory reason

for Branch's termination.  As explained in the Title VII *McDonnell Douglas* analysis, the

Defendants have maintained that Branch was terminated for violating numerous Work Rules,

including leaving campus without permission, failing to sign 23 of 24 logbooks for three

consecutive shifts, and insubordination.  These violations suffice as legitimate,

nondiscriminatory reasons for termination, which have no relation to Branch's use of FMLA

leave, because Temple's Work Rules specify that failing to sign log books is a terminable

offense.  *See Norman*, 485 F. App'x  at 593 (finding employee's manipulation of payroll records

and fraudulent behavior were legitimate reasons for termination unrelated to employee's age);

*Reeves*, 530 U.S. at 142 (finding employee's failure to follow work rules and keep accurate

records amounted to legitimate reason for termination).

The Court finds that the Defendants have satisfied the second prong of the *McDonnell*

*Douglas* burden shifting framework for purposes of this motion.

### c.  Plaintiff's Showing that Defendants' Reason is Pretextual

Because Defendants have provided legitimate, nonretaliatory reasons for Branch's

termination, the burden shifts to Branch to demonstrate the Defendants' proffered justification

for terminating him is merely pretextual.

To show pretext, Branch must point to "'some evidence, direct or circumstantial, from

which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action.'"  *Parker v. Verizon Pa., Inc.*, 309 F.

App'x 551, 556 (3d Cir. 2009) (quoting *Fuentes*, 32 F.3d at 764–65).  To do so, Branch cannot

simply show that the employer's decision was wrong or mistaken, but instead "must demonstrate

such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in

[Defendants'] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765.

To show that retaliation was more likely than not a motivating factor or determinative cause of Defendants' action, Branch "must point to evidence with sufficient probative force" for a factfinder to make this conclusion. *See Parker*, 309 F. App'x at 556. Branch may point to evidence that Defendants previously retaliated against him, Defendants retaliated against other persons within Branch's protected class, or that Defendants have treated more favorably similarly situated persons not within the protected class. *See id.*; *Simpson*, 142 F.3d at 644–45.

Branch argues that the following evidence supports his contention that Defendants' justification is pretext for his retaliation claims: (1) testimony by Frank Zumpino revealing that Defendants' management was not happy when employees took FMLA leave; (2) Defendant Ounan's "witch hunt" and documented efforts to discipline Branch for lateness and/or sick days; (3) evidence that Scot Turgeon, a white engineer, took FMLA leave without retaliation; and (4) that Branch was terminated two days following his request to use approved FMLA.

Defendants argue that Plaintiff's reasons to show pretext are not based on any evidence, and the record shows that Branch was terminated because he was excessively late, failed to respond to a critical alarm in April 2019, failed to sign his logbooks or use LogCheck, used his personal vehicle during shifts, and he could not be located for several hours during his January 21, 2020 shift. Defendants maintain that, while Branch might disagree with the reasons for his termination, Branch cannot prove that his termination was a pretext for retaliation.

The Court finds that Branch was presented sufficient evidence creating genuine issue of material facts, thereby precluding summary judgment. Plaintiff has pointed to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant Ounan's reasons

35

for Branch's termination.  Specifically, Plaintiff points to Defendant Ounan's deposition where he admits that his spot check actually took place over the course of a few days, rather than one day, and also admits that he had not checked every single building that Branch was assigned. These inconsistencies, viewing the evidence in the light most favorable to Branch, may lead a reasonable factfinder to rationally find Defendants' proffered legitimate reasons for its actions are "unworthy of credence" and that Defendants terminated Branch for his use of FMLA two days prior.  *See Fuentes*, 32 F.3d at 765.

To further show pretext, Branch has also pointed to emails in the record where Defendant Ounan requested Temple Police video, for the first time in his career, to corroborate his reasons for Branch's terminations.  Further, upon learning from Temple Police that Branch stayed on campus during his January 19 shift, Defendant Ounan replied "[t]hat's not good," and asked Temple Police to "please look back at those days to make sure he leaves campus… "  A reasonable factfinder could believe that an "invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action".  *See Parker*, 309 F. App'x at 556; *Fuentes*, 32 F.3d at 764–65.

This evidence is sufficient to raise a genuine issue of material fact as to whether Defendants' proffered reasons for Branch's termination were pretextual, so Defendants' summary judgment motion against Branch's FMLA retaliation claim will also be denied.

**V.    <u>CONCLUSION</u>**

For the foregoing reasons, Defendants' motion for summary judgment against all of Plaintiff's claims will be denied.  An appropriate order follows.

**DATE:** 8/12/2021                    **BY THE COURT:**

/s/ Chad F. Kenney

_____

**CHAD F. KENNEY, JUDGE**